887 So.2d 524 (2004)
Agnes G. DESSELLE, Carol Desselle Garcia, Rene' Desselle, Patricia Desselle and Rachel Desselle, Gwendolyn Desselle Broussard and David M. Desselle
v.
JEFFERSON PARISH HOSPITAL DISTRICT NO. 2 D/B/A East Jefferson General Hospital.
No. 04-CA-455.
Court of Appeal of Louisiana, Fifth Circuit.
October 12, 2004.
*527 Brian L. Reboul, Metairie, LA, for Plaintiff/Appellant.
Thomas P. Anzelmo, Sr., Jacqueline Blankenship, Metairie, LA, for Defendant/Appellee.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SOL GOTHARD, JAMES L. CANNELLA.
JAMES L. CANNELLA, Judge.
The Plaintiffs, Agnes Desselle, Carol Desselle Garcia, Rene Desselle, Patricia Desselle, Rachel Desselle, Gwendolyn Desselle Broussard and David M. Desselle, appeal from a judgment in their suit filed for the injuries and death of their husband and father, Louis Roy Desselle, the decedent, against the Defendant, Jefferson Parish Hospital District No. 2 d/b/a East Jefferson General Hospital (EJGH). We affirm.
The 79 year-old decedent entered EJGH on July 13, 2001 for surgery due to colon cancer. He had suffered from a myriad of physical problems and had been on the blood thinner, Coumadin, for 20 years. On July 16, 2001, Sharmika Gibson (Gibson) an employee of EJGH, arrived at his room to transport him to the radiology department for a Computerized Axial Tomography (CAT) scan of his brain due to episodes of mental confusion originating after heart surgery which he had undergone some months before. Gibson pushed the gurney to the bed and instructed the deceased to roll over onto the gurney. She went to the head of the bed, rather than supporting it from the side. Either she failed to set the brake or the brake failed. When the deceased rolled over, the gurney moved away from the bed causing the decedent to fall to the floor. The decedent's wife was in the room at the time. After ascertaining that the decedent was not apparently injured, he was transported to radiology and the CAT scan was performed 48 minutes later. No brain hemorrhaging or other head/brain injury was detected at that time. On July 21, 2001, the deceased began complaining of a severe headache. Another CAT scan disclosed a massive parenchymal hemorrhage of the right side of the decedent's brain. A third CAT scan on July 26, 2001 showed that the bleed was continuing. On July 27, 2001, he died from the brain hemorrhage.
The Plaintiffs filed a medical malpractice suit on June 11, 2003 against the Defendant.[1] In addition to damages for wrongful death, survival damages and damages due to the fall, the Plaintiffs claimed damages for the spoliation of evidence (the gurney.) A judge trial was held on December 10, 11, and 12, 2003. The trial judge found the Defendant liable for injuries to the decedent due to the fall from his hospital bed and awarded the Plaintiffs' $18,000 for his pain and suffering. He found no causation between the fall and the brain hemorrhage that resulted in the death of the decedent and dismissed the claims for wrongful death and survival. In addition, the trial judge denied the claim for spoliation on the basis that the only *528 damages the Plaintiffs could recover are for the non-death related damages, which have already been awarded.
On appeal, the Plaintiffs assert that the trial judge erred in failing to apply the presumption of legal causation for the death, in erroneously determining that the death was not caused by the negligence of the Defendant, in failing to reasonably consider the deposition testimony of Dr. John Stirling Meyer, in failing to properly interpret the expert medical testimony, and in failing to find the Defendant negligent in maintaining inaccurate and incomplete medical records. The Plaintiffs further assert that the trial judge awarded inadequate damages for the fall and erred in failing to award damages for the mental anguish, loss of consortium and inconvenience to the family members. The Plaintiffs contend that the trial judge erred in failing to find that the Defendant breached the standard of care for administering excessive anticoagulants, thereby increasing his risk of excessive bleeding, and for not awarding damages for overmedicating the deceased. They also argue that the trial judge erred in denying their claim for spoliation of the evidence.

STANDARD OF REVIEW
On appellate review, the court's function is to determine whether the findings of the trier of fact were clearly wrong or manifestly erroneous. Matta v. Snow, 01-760, p. 7 (La.App. 5th Cir.1/15/02),807 So.2d 934, 938; Brown v. Seimers, 98-694, p. 6 (La.App. 5th Cir.1/13/99), 726 So.2d 1018, 1021, writ denied, 99-0430 (La.4/1/99), 742 So.2d 556; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Matta, 01-760 at p. 7, 807 So.2d at 938; Brown, 98-694 at p. 6, 726 So.2d 1018 at 1021; Rosell, 549 So.2d at 844. The issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether its conclusion was a reasonable one. Matta, 01-760 at p. 7, 807 So.2d at 938; Brown, 98-694 at p. 6, 726 So.2d 1018 at 1021; Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993).

PRESUMPTION OF LEGAL CAUSATION
A plaintiff in a personal injury lawsuit must prove causation by a preponderance of the evidence. Farrell v. Pierre, 02-1136, p. 8 (La.App. 5th Cir.4/8/03), 846 So.2d 49, 54; Calcagno v. Kuebel, Fuchs Partnership, 01-691, p. 11 (La.App. 5th Cir.11/14/01), 802 So.2d 746, 752; Dabog v. Deris, 625 So.2d 492, 493 (La.1993). The plaintiff is aided in this endeavor by the legal presumption that a medical condition producing a disability resulted from a preceding accident if the injured person was in good health prior to the accident, the disabling condition manifested itself shortly after the accident, and the medical evidence indicates that there is a reasonable possibility of a causal connection between the accident and the disabling condition. Farrell, 02-1136 at 8, 846 So.2d at 54, citing Calcagno, 01-691 at 11, 802 So.2d at 746, 752; Dabog, 625 So.2d at 494, citing Housley v. Cerise, 579 So.2d 973, 980 (La.1991).
A hospital can be held responsible for the negligence of its employees under the doctrine of respondeat superior. LeRay v. Bartholomew, 03-1370, p. 23 (La.App. 5th Cir.3/30/04), 871 So.2d 492, 507. Under this theory, the same standard of care and burden of proof for the physician or nurse whose activities are questioned are appropriate. Id. The burden of proof for medical malpractice is set forth in La. *529 R.S. 9:2794 and requires a showing that the medical treatment fell below the ordinary standard of care expected of physicians in that field of medical care, and a causal relationship between the injury and the alleged negligent treatment. LeRay, 03-1370 at 23, 871 So.2d at 507.
The deceased was admitted to East Jefferson on July 13th with a diagnosis of lower GI bleed as a result of colon cancer. His medical history included cerebral vascular insufficiency and vascular disease. He had undergone coronary artery bypass surgery and aortic valve replacement. He was on chronic anticoagulant therapy. The deceased had chronic liver disease with cirrhosis, carcinoma of the colon and depression. His artificial heart valve and chronic atrial fibrillation required him to take the blood thinner, Coumadin, which he had been on for 20 years. However, there was no indication that he had suffered any brain hemorrhaging before he was admitted for the colon surgery. Surgery was scheduled for July 20, 2001.
The deceased's wife, Agnes Desselle, witnessed the accident with the gurney. She testified that she did not see her husband strike his head when he fell off the bed, but he told her so. He also told her later that he had a headache. Mrs. Desselle and her adult daughter, Rachael Desselle (Rachael) testified that before he entered the hospital, the deceased was having mild episodes of confusion, but only in the evening ("twilight confusion"). They contended that this condition worsened after the fall. They testified that the deceased became increasingly disoriented about where he was, the year, and was having hallucinations. The deceased thought that Rachael was a drug dealer at one point. He did not want anyone touching him and was irritable. The Plaintiffs further contend that the deceased developed severe diarrhea after the fall and, that from the time of the accident onward, complained of headaches. Mrs. Desselle admitted that he had some incontinence before the fall, but claimed it too became worse after the accident.
Rachael testified that she filled out the admission form on Friday, June 13, 2001. She said that her father was unsteady and confused when he was admitted into the hospital. She stated that the deceased's confusion started after the carotid artery surgery, but was limited to the evenings. Otherwise, he was fine mentally. Because she worked out of town, Rachael was only there over the first week-end. She returned on the following Thursday to find that her father's condition had deteriorated "beyond belief."
Dr. Songy, the deceased's treating physician and personal friend for over 20 years, testified that the deceased's medical condition and neurological status had been worsening over the weeks preceding the admission, and that the deceased was disoriented, confused and slower than normal when he was admitted. The deceased had undergone carotid artery surgery before he was scheduled for the colon surgery and had been confused and hallucinating since then. The angiogram taken at that time showed severe arterial sclerotic disease. The surgery to the carotid artery had to be performed before the colon surgery because narrowing of the artery predisposed him to suffering a stroke. Because of the severity of the arterial sclerotic disease, one side of the neck was inoperable.
On July 16, 2001, Dr. Donald Adams, a neurologist, started treating the deceased for his confusion because the colon procedure could not be performed until the deceased's mental condition improved. Dr. Adams ordered a CAT scan. The deceased was being transported for the scan when the accident occurred.
*530 According to Dr. Songy and Dr. Adams, when the colon cancer was first discovered, the deceased's multiple problems made it too risky to operate, so the decision to remove the cancer in his colon was deferred. When he began to have gastrointestinal bleeding, it became necessary to operate. Before surgery could be performed, the Coumadin had to be stopped and he had to be placed on a shorter acting blood thinner so that he did not bleed-out during the surgery. He had to be kept on blood thinners so that he did not develop blood clots that could migrate to the brain. Thus, Heparin was substituted for the Coumadin by intravenous injection (IV). The clotting levels were monitored to obtain the optimum level, but it reached a "panic state" (120) when the Heparin was first injected. It was immediately discontinued. Dr. Songy noted that because Heparin was short acting, the blood thinning effect stopped when the IV was discontinued. Dr. Songy wanted the level to be between 60-90. Over the next few days, the clotting time, which is referred to as the partial thromboplastin time (PPT) level, still remained higher than 90, but Dr. Songy was trying to get a level that was not too low, thereby increasing the risk of a migrating blood clot, or too high, risking hemorrhaging. When it failed to come down further, Dr. Songy replaced the Heparin with Lovenox, another short acting blood thinner.
Dr. Adams testified that the deceased's various pre-existing conditions created a "medical nightmare." Dr. Adams noted that it was a "damned if you do and damned if you don't" situation because stopping the blood thinners to perform the cancer surgery increased the risk of the formation of blood clots that could migrate from the heart into the brain causing "really nasty strokes." He also noted that if even if the cancer had been operated upon, there was a risk of mental confusion that does not always clear up.
Both Dr. Songy and Dr. Adams testified that the incontinence was expected. The doctors ordered a strong laxative in preparation for a colon study and the surgery. The doctors wanted the bowels cleaned and expected the deceased to have diarrhea from the laxative. In addition, the deceased was on medication to reduce his blood ammonia level, which also causes loose stools. He was incontinent because he had poor mobility and was confused, so was unable to make it to the bathroom at times.
The Plaintiffs argue that the deceased exhibited no symptoms of a cerebral hemorrhage prior to the accident. They note that the CAT scan taken 48 minutes after the fall showed no indication of old or pre-existing cerebral hemorrhage. Thus, they argue that it is reasonable to conclude that overmedication and the fall from the gurney caused the hemorrhage and that the Court should apply the presumption of causation. We disagree. The decedent suffered from degrees of confusion, hallucinations and incontinence prior to the accident. He was not in good health prior to the accident and there was no disabling condition resulting from the fall that manifested itself shortly after the accident. See: Farrell, 02-1136 at p. 8, 846 So.2d at 54. Thus, we find that the test for applying the presumption was not met in this case and the trial judge did not err in declining to apply it.

CAUSATION
The primary issue is whether the trial judge committed manifest error in concluding that the fall and/or the overmedication did not cause the brain hemorrhage five days later. The Plaintiffs assert that the trial judge erred in failing to consider the deposition testimony of Dr. John Stirling *531 Meyer, in failing to properly interpret the expert medical testimony, and in failing to find the Defendant negligent in maintaining inaccurate and incomplete medical records.
On July 14, 2001, the Coumadin was replaced with a short acting anticoagulant, Heparin. The nurse failed to read the doctor's orders and administered a "bolus" to boost the level, per hospital protocol, but the doctor's orders stated "no bolus." This caused the deceased's PPT level to rise to a "panic state" of 120.8. The PPT measures the blood clotting speed. The higher the number, the more likely the patient is to have some bleeding. The Heparin was immediately discontinued when the laboratory reported the emergency. Two days later, on the 16th, the level was 94.5, still outside the acceptable range for EJGH, but was not overly excessive according to Dr. Songy. That was because the deceased was being given levels of the medication based on the erroneous determination of his weight. Dr. Songy testified that he wanted the levels to be between 60 and 90 because of the implications for surgery. The therapeutic range is between 60-70. Nevertheless, on July 16, 2001, the anticoagulant was changed from Heparin to Lovenox, which does not need monitoring and is administered by injection instead of IV. Lovenoex is a "low molecule Heparin."
Dr. John Stirling Meyer, an expert neurologist, testified that the overmedication by the Defendant's nurses harmed the vessel walls. He testified that there was a 7% increase in the likelihood of a cerebral vascular accident for each increment of time (every 10 seconds) that the increased medication was in the patient's blood stream. He referred to an article in a medical journal, Circulation, documenting that fact. The defense experts, Dr. Songy and Dr. Adams, did not dispute that fact. Dr. Meyer also pointed to the deceased's low platelet count as a condition predisposing him to bleeding. He concluded that the force of the fall contributed to the hemorrhage due to the deceased's predisposition to hemorrhage from the compromised vascular walls and overmedication. Dr. Meyer concluded that it was more probable than not that the hemorrhage was caused by the negligence of the Defendant.
There is no question that the anticoagulant medication levels were higher than the protocol or higher than Dr. Songy's target level for several days, and could have compromised the blood vessels. However, Dr. Songy, Dr. Adams, Dr. Michael Puente, a neurologist, and Dr. Daniel Fontanez, the radiologist that performed the scans on the deceased, testified that neither the fall nor the overmedication was responsible for the brain hemorrhaging. They pointed out that regular doses, as well as excessive doses of anticoagulants can cause intraparenchymal hemorrhage. There was no disagreement by the doctors that anticoagulants predispose patients to bleeding and make the patient more susceptible to a hemorrhage if the patient sustains a head injury, or that it would take less force from a fall to trigger a hemorrhage in a person being given anticoagulants. However, all of the physicians, except for Dr. Meyer, concluded that an anti-coagulant-caused hemorrhaging would more likely have occurred on July 14, 2001 when the PPT level was 120. Further, the hemorrhaging would have developed at the latest within 24-48 hours, or by July 18, 2001. Here, the bleeding occurred on June 21, 2001.
Dr. Songy noted that the symptoms of a brain hemorrhage include confusion, hallucinations, irritation, personality changes, impatience, incontinence and abnormal electroencephalogram (EEG). However, *532 he testified that the deceased had been having problems with confusion and hallucinations since his carotid artery surgery prior to this hospitalization. When the deceased was admitted, he was slower than normal. In addition, the deceased was taking a medication ordered by Dr. Adams, that can cause hallucinations. Dr. Songy also testified that, although the deceased's EEG was abnormal on July 17, 2001, this was attributable to the prior cognitive decline. Dr. Songy stated that the nursing report showed that the deceased became incontinent of both bowel and urine (which had been normal) on July 18, 2001. However, the notes also state that the deceased was feeling good and looked good. On that same day, Dr. Adams also reported that the deceased's brain function was improving, he reported no headaches, had no complaints and his mind was clear. In addition, the deceased did not exhibit the end stage breathing effect of a brain problem until July 22, 2001.
Dr. Songy testified that he examined the deceased every day and saw no sign of a head injury. There was no change is his level of consciousness, respiration or vital signs. A contusion on the brain would have been visible early on the CT scan. Here, none was detected. Dr. Songy testified that a hematoma enlargement can extend for a number of hours from onset to 20 hours, but not for five days. The bleeding here was not seen until July 22, 2001. Had the hemorrhaging been from the fall, deterioration would have occurred within 24 hours. Again, he stated that the deterioration in the brain would not have taken five days to manifest.
In reference to the fall, Dr. Songy testified that he was informed by the nursing staff when the accident happened, but was not told that the deceased actually fell to the floor. He thought that deceased fell from the bed to the gurney. He further stated that the family, whom he had known for 20 years, did not tell him that the deceased suffered a fall in which he struck his head.
Dr. Fontanez performed the CT scans on July 16, 22 and 26, 2001. The scans showed age related changes on July 16th, but nothing consistent with a head injury. He testified that intercerebral bleeding would have shown up one hour after the injury, although minute petechial hemorrhaging could show up later. That type of bleeding is manifested as small red dots, which can show up on the scan. However, he said that the bleeding that caused the deceased's death was in an area not normally associated with this condition, that this type of hemorrhaging is usually associated with hypertension, and that it would not evolve into a lesion such as caused the deceased's death. In his opinion, that hemorrhage was a fresh event, around twelve hours old. Furthermore, Dr. Fontanez noted that he did not find any evidence of damage from axonal shearing where the parts of the brain are shaken back and forth. That damage would show up immediately and a three foot fall would not cause it.
Dr. Songy, Dr. Adams and Dr. Puente testified that the deceased's incontinence was caused by the laxative that he was given in preparation for the surgery scheduled for July 20, 2001 and to attempt to clear up the mental confusion. Dr. Songy explained that the changes in the deceased's mental status could have been attributed to his liver condition. The doctor stated that cirrhoses can cause bleeding in the intestine, infusing the intestine with protein, which in turn can trigger confusion and agitation, referred to as hepatic encephalopity. A laxative is given to empty the area of the protein. He doubted that the mental status of the deceased *533 had anything to do with the deceased's incontinence, which was more likely caused by the laxative.
On July 19, 2001, the decedent's PPT level was 72.9, the deceased reported no headaches and no bleeding was detected. However, when Dr. Songy saw him that evening, the deceased again had no idea where he was. Because the deceased continued to have the episodes of confusion, disorientation and hallucination from the time of his admission, that were not getting better, Dr. Songy talked to the family about canceling the surgery, which they agreed to do after a family meeting. The reason was that the anesthesia can also cause confusion, and with the deceased's continued problems in that area, the doctors would not know if the anesthesia was causing the problem. Dr. Songy testified that the deceased had not shown any changes in his mental state between July 17 and July 21, 2001, otherwise he would have noted it in the records.
Dr. Puente's testimony tracked the testimony of Dr. Songy, Dr. Adams and Dr. Fontanez. He agreed with their conclusion that there was no connection between the brain hemorrhage and the medications or the fall. He stated that patients' of the deceased's age often suffered from this type of hemorrhage and that the doctors often do not know the cause. It can happen spontaneously. He stated that the hemorrhage more likely would have occurred within a few hours had trauma been the cause. He also testified that the CAT scan indicated that that hemorrhage was fairly fresh development. Dr. Puente noted that the deceased's condition could have deteriorated due to the medications, metabolic changes, sodium changes and/or changes in the liver.
The Plaintiffs argue that the trial judge erroneously discounted Dr. Meyer's testimony because it did not support his conclusions. We agree with the Plaintiffs that Dr. Meyer supported his conclusions, but several other physicians disagreed with that opinion. The trial judge's rejection of Dr. Meyer's testimony was a credibility determination. The standard of review by this Court is whether the trial judge manifestly erred in relying on the testimony of the other doctors to determine that the brain hemorrhage that caused the death of the Plaintiffs' husband and father was not caused by the fall or overmedication of anticoagulants. In that regard, where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Brown, 98-694 at p. 6, 726 So.2d 1018 at 1021; Stobart, 617 So.2d at 882. Only where the documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, may the court of appeal find manifest error, even in a finding purportedly based upon a credibility determination. Brown, 98-694 at p. 7, 726 So.2d at 1021; Rosell, 549 So.2d at 844-45.
The deceased in this case suffered from numerous physical complaints and had been troubled with mental confusion and disorientation for several months prior to the accident. He was unstable and confused when he was admitted. He suffered from some incontinence before he fell from the bed, was being given strong laxatives, and was not very mobile, which accounts for his incontinence problems. Although the Plaintiffs testified these conditions worsened after the fall, the Plaintiffs did not show by a preponderance of the evidence that those symptoms worsened due to overmedication or the fall. While we agree that the Defendant's employees negligently overmedicated the deceased *534 with the short acting Heparin, once the infusion was stopped, the effect also stopped. This happened on the day of the fall, but the brain hemorrhage did not occur until five days later. There was credible medical testimony by two neurologists, the treating primary physician and the radiologist that the fall was too minor and too remote in time to have caused the hemorrhage, as was the overmedication. Although Dr. Meyer disagreed with these opinions, the trial judge's choice to reject his conclusions was a reasonable one based on the evidence. Thus, we find no manifest error in the trial judge's factual finding that the Defendant's actions did not cause the death of the deceased and in dismissing the claims for wrongful death and survival damages.
The Plaintiffs argue that the trial judge failed to find the Defendant negligent in maintaining inaccurate and incomplete medical records. However, in light of our conclusions on liability, we find no error in this regard.

DAMAGES
The Plaintiffs further assert that the trial judge awarded inadequate damages for the fall and erred in failing to award damages for the mental anguish, loss of consortium and inconvenience to the family members.
The trial judge awarded the Plaintiffs $18,000 for the deceased's pain and suffering from the fall. There were no apparent injuries. At the most, the deceased complained of a headache. There was no evidence that the fall, without its connection to the deceased's death, affected the family members in any significant way. Thus, we find no error in the award of general damages for the deceased's pain and suffering from the accident.

SPOLIATION
The Plaintiffs also assert that the trial judge erred in denying their claim for spoliation of the evidence. They contend that the Defendant failed to preserve the gurney in the condition in which it existed at the time of the accident, thereby depriving them of their ability to maintain a lawsuit against the manufacturer.
The theory of "spoliation of evidence" refers to an intentional destruction of evidence for purpose of depriving opposing parties of its use. Pham v. Contico Intern. Inc., 99-945, p. 4 (La.App. 5th Cir.3/22/00), 759 So.2d 880, 882; Quinn v. RISO Investments, Inc., 03-0903, p. 5 (La.App. 4th Cir.3/3/04), 869 So.2d 922, 927. A plaintiff asserting a state law tort claim for spoliation of evidence must allege that the defendant intentionally destroyed evidence. Allegations of negligent conduct are insufficient. Pham, 99-945 at 4, 759 So.2d at 882; Quinn, 03-0903 at 5, 869 So.2d at 927. Where suit has not been filed and there is no evidence that a party knew suit would be filed when the evidence was discarded, the theory of spoliation of evidence does not apply. Quinn, 03-0903, p. 5, 869 So.2d at 927; Smith v. Jitney Jungle of Am., 35,100, p. 11 (La.App. 2nd Cir.12/5/01), 802 So.2d 988, 995, writ denied, 02-0039 (La.3/15/02), 811 So.2d 913. The tort of spoliation of evidence has its roots in the evidentiary doctrine of "adverse presumption," which allows a jury instruction for the presumption that the destroyed evidence contained information detrimental to the party who destroyed the evidence unless such destruction is adequately explained. Pham, 99-945 at 4, 759 So.2d at 882; Quinn, 03-0903 at 5, 869 So.2d at 927.
The trial judge agreed that the Defendant was negligent in this regard, but there was no prejudice to the Plaintiffs since the accident did not cause the death *535 and he awarded the Plaintiffs damages related to the defective gurney. Under Pham, this Circuit does not recognize a tort of negligent spoliation. Furthermore, there is no evidence that the Defendant "destroyed" the gurney knowing that suit would be filed. Thus, the trial judge did not err in failing to award damages for spoliation of the evidence.
Accordingly, the judgment of the trial court is hereby affirmed. Costs of this appeal are to be paid by Plaintiffs.
AFFIRMED.
NOTES
[1] The medical malpractice review panel found that the Defendant was negligent in injuring the deceased in the fall, but that the fall did not cause or contribute to the brain hemorrhage.