SUCCESSION OF FRANK ANTHONY
MESSINA, SR.

NO. 22-CA-172

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 817-943, DIVISION "J"
HONORABLE STEPHEN C. GREFER, JUDGE PRESIDING

November 30, 2022

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Jude G. Gravois, and Marc E. Johnson

<u>**AFFIRMED**</u>
  **JGG**
  **SMC**
  **MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLANT,
ANN M. CARMAN
    R. Scott Buhrer
    Lauren K. Marquette

COUNSEL FOR PLAINTIFF/APPELLEE,
FRANK A. MESSINA, JR. DULEY APPOINTED AND QUALIFIED
ADMINISTRATOR FOR THE SUCCESSION OF FRANK A. MESSINA SR.
    Ryan S. McBride

**GRAVOIS, J.**

Appellant, Ann Messina Carman, appeals the trial court's December 7, 2021 judgment which denied her petition to probate a copy of an olographic will of her late father, Frank Anthony Messina, Sr. Herein, Ann asserts that the presumption of revocation by destruction of the will in the present case is weak, and based on the testimony and evidence presented, the trial court erred in failing to find that she proved that her father did not revoke the will by destroying it. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On March 19, 2021, Frank Anthony Messina, Sr. died. He was survived by his spouse, Sandra Messina ("Sandy"), and three adult children from his first marriage,[1] Frank Anthony Messina, Jr., Janene Messina Allen, and Ann Messina Carman. On May 25, 2021, Frank, Jr. filed a Petition for Appointment of Administrator, alleging that Frank, Sr. died intestate and that he wished to be appointed administrator of his father's succession. On June 11, 2021, the trial court appointed Frank, Jr. as administrator of the succession proceeding.

On June 17, 2021, Ann filed a Petition and Order to File and Execute Olographic Testament and to Appoint Dative Independent Executrix. In her petition, Ann alleged that Frank, Sr. died testate and executed an olographic will on February 2, 2009. Ann further alleged that though a diligent search for the original will was made following Frank, Sr.'s death, the original of the will could not be located. A photocopy of the original will was attached to the petition. The will names Ann as the sole legatee and states, "She (Ann M. Messina) also can do as she please[s] to, share with her sister and brother or not."

---

[1] Frank, Sr. was married four times, first to Shirley Poleto, from whom he was divorced; second to Donna Messina, from whom he was divorced; third to Diane Messina, from whom he was divorced; and fourth to Sandy Messina, who survived him.

Following a hearing on November 30, 2021, the trial court signed a written judgment on December 7, 2021, denying Ann's Petition to File and Execute Olographic Testament and to Appoint Dative Independent Executor, and finding that Frank, Jr. shall remain the duly appointed administrator of the succession. This appeal followed.

## LAW AND ANALYSIS

When a will cannot be found at the testator's death, there arises a presumption that the testator has destroyed the will with the intent of revoking it. *Succession of Talbot*, 530 So.2d 1132, 1134-35 (La. 1988); *In re Succession of LeGardeur*, 99-699 (La. App. 5 Cir. 11/30/99), 747 So.2d 204, 207, *writ denied*, 00-0124 (La. 3/24/00) 758 So.2d 150. The presumption may be rebutted by "clear proof" of the following: "(1) the testator made a valid will; (2) proof of the contents or substance of the will; [and] (3) the will, though not found at [the] testator's death, was never revoked by the testator." *Succession of Justice*, 28,363 (La. App. 2 Cir. 8/23/96), 679 So.2d 597, 599, citing *Succession of Talbot*, *supra*; *Succession of Nunley*, 69 So.2d 33 (La. 1953); and *Hamilton v. Kelley*, 641 So.2d 981 (La. App. 2d Cir. 1994). A proponent of such a will assumes the burden of demonstrating that the testator did not intend to revoke the will by destroying it. *Succession of Talbot*, 530 So.2d at 1135. The jurisprudence has recognized "a sliding scale of proof sufficient to rebut the presumption depending on the weakness or strength of the evidence surrounding the lost original." *Succession of Altazan*, 96-0409 (La. App. 1 Cir. 11/8/96), 682 So.2d 1320, 1322.

In *Succession of Talbot*, 530 So.2d at 1135, the Louisiana Supreme Court discussed this presumption, stating:

> … The presumption may be weak or strong, and more or less easily rebuttable, depending on the clarity of the evidence as to whether the testator was the author of the will's destruction, whether he expressed an intention to revoke the will, whether he had access to other originals of the will prior to his death, whether he treated any

extent copy of the will as not having been revoked, and as to any other issue bearing upon the testator's intention with respect to the destruction and revocation of the will.

Because the issues in this appeal are factual ones, the standard of appellate review of the matter is whether the factual findings made by the trier of fact are manifestly erroneous. *In re Succession of LeGardeur*, 747 So.2d at 206. Under that standard, the inquiry is not whether this Court, had it been sitting as the trier of fact, would have made the same findings, but rather whether the findings made in the trial court are reasonable in light of the entire record of the case. *Id.* When the trial court's findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the factfinder's conclusions, because "only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989); *Palmisano v. Ohler*, 16-160 (La. App. 5 Cir. 12/7/16), 204 So.3d 1134, 1137-38. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even if the appellate court may feel that its own evaluations and inferences are as reasonable. *Desselle v. Jefferson Hosp. Dist. No. 2*, 04-455 (La. App. 5 Cir. 10/12/04), 887 So.2d 524, 528.

On appeal, in her only assignment of error, Ann argues that based on the testimony and evidence presented at trial, the trial court committed manifest error in denying her Petition and Order to File and Execute Olographic Testament. Specifically, she argues that the presumption of revocation by destruction is weak in this case and was rebutted by the testimony and evidence presented. She argues that there is no direct evidence that Frank, Sr. intended to revoke his will, and that the testimony established that another copy of the will was found in his office after he suffered a stroke, three of the four witnesses at trial testified that Frank, Sr.

verbally expressed his intention to leave everything to Ann, and there was no evidence of any other testament.

At the hearing, it was established that Frank, Sr. was previously married four times, with three children from his first marriage. He was married to Sandy at the time of his death. He and Sandy had known each other since 1968, and they reconnected in November 2019. They began living together in December 2019 and were married in September 2020. Frank, Sr. was in good health until he suffered a CVA (cerebrovascular accident/stroke) on December 24, 2020. He was brought to Ochsner's main campus hospital where he stayed for approximately three weeks. He then went to rehab for three to four weeks until he was released home. Following his stroke, Frank, Sr. was paralyzed on one side. He initially could not see, but Sandy testified that this improved over time. He could speak and was coherent. He was home for two or three weeks before it was discovered that he had inoperable cancer in his throat. He died on March 19, 2021.

Following Frank, Sr.'s death, the three siblings agreed to open his succession and split everything evenly. Ann testified that she discussed the will with her siblings, and they acknowledged the will. She admitted that she never told the succession attorney about the will because they were not going to be using it.[2] During a second meeting with the succession attorney via Zoom, the siblings agreed that Frank, Jr. would be the administrator of the succession. While on Zoom, Ann signed the Verification and Concurrence Affidavit relative to the petition to appoint Frank, Jr. as administrator, but she never returned the paperwork to the attorney. Ann testified that "things changed" when she wanted to go through her father's possessions, as that was very important to her, but Janene and Frank, Jr. had gone through his things before her. Also, she testified that they

_____

[2] Both Janene and Frank, Jr. testified that Ann never brought up the will as they began the succession proceeding.

would not give her the keys to her father's house and truck. She felt like they were trying to hide his will and paperwork.

Ann testified that her father always liked to "plan ahead" and made it a point to discuss what was going to happen when he passed away. Over ten years ago, he mailed her a copy of the two-page, hand-written will dated February 2, 2009. She saw the original will between four to six years ago in his office. Following that, he would check to make sure she still had the copy of the will he had given her. In August 2019, while she was visiting her father, he showed her his new safe and gave her the safe code. Frank, Sr. told her that she should take everything from the safe if something were to happen to him. She did not observe the original of the will at that time. From August 2019 until December 2020, she would speak with her father every two to three weeks. He always reiterated that he was leaving everything to her, and she could decide if she wanted to share things with her siblings.[3] She did not know of any other will, and Frank, Sr. never discussed with her providing for Sandy after his death. She testified that her father had the occasion to get angry with her and her siblings, but once he sent the will to her, he never indicated that he was changing the contents of the will.

Ann testified that sometime in January 2021, while her father was in the hospital, she was on the phone with Janene and Frank, Jr., and Janene told her that she and Sandy found the original will and multiple copies in Frank, Sr.'s office. Ann knew it was the same will because it left everything to her and had her social security number on it. After her father died, access to her father's house was not restricted, but while Sandy still lived there, Ann testified that she was not going to go into the house. When she did return to her father's house, it had already been

_____

[3] Ann did testify, however, that there was a "point in time" right before the 2020 election when she did not speak with Frank, Sr.

cleared out by her siblings. She testified she never made a personal search for the original will after Frank, Sr. died.

Sandy testified that from the very beginning, once she reconnected with Frank, Sr., he told her that his will left everything to Ann and he wanted Ann to split it up among the siblings as she saw fit. "As time went on," Frank, Sr. would tell her that he wanted her to have usufruct of the house if he died first and whatever money was in the safe. During a conversation that occurred between Thanksgiving and Christmas 2020, just prior to him having his stroke, Frank, Sr. again discussed his desire to leave Sandy a usufruct of the house, and she told him that's a "legal thing" and it did not matter what he would tell his kids about it. Frank, Sr. responded that "we're just going to rearrange and readjust and do paperwork, and we'll get it all done and set up." When asked if she knew if he ever went to lawyer, Sandy responded:

> To my knowledge, no, he didn't. If – if the will had been in the safe, I don't know. It was in the desk. If he had planned on trying to rewrite or redo something, I don't know. You know, I can only assume that maybe that's why it was there in the office. I mean, I would keep something like that in a safe. But I'm not Frank Messina.

Sandy noted that Frank, Sr. was "very meticulous in how he kept his things." While he was hospitalized, Frank, Sr. gave the safe code to Janene and Sandy so they could pay bills. When they went through the safe, no will was found. In January 2021, Sandy did find a Xerox copy of a hand-written will in an envelope in the drawer of the desk in his office.[4] She quickly viewed it, and she told Janene to take a look at it. When shown a copy of the 2009 will in question, she testified that she had "no idea" if the copy of the will she found and the copy of the 2009 will in question were the same document. She said the siblings told her that their dad would write a will all the time depending on who he was or was not mad at,

---

[4] Sandy testified later that it was either just before or after Frank, Sr. died that she found the copy of the will.

and it was "a family little 'ha-ha, that's Daddy.'" This was the only will she had seen.

Janene testified that sometime after February 2009, her father would ask for her social security number so he could include her in his will. Though he verbally told her she would be in his will, she never saw a will that included her. While Frank, Sr. was in the hospital, he told Janene to make sure Sandy was taken care of and expressed his desire for Sandy to have power of attorney, make decisions for him, and stay in his house. To Janene's knowledge, Frank, Sr. never executed a power of attorney.

In January 2021, Sandy told Janene about the will she had found in the office, and a few days later Janene looked at the will. Janene testified that the will she saw was not the same as the will presently in question. She stated that the will she saw had a different date – not 2009. The will did leave everything to Ann and stated that if Ann wanted to share, she could or could not. At no time did she ever observe an original will executed by her father. After Frank, Sr. died, she and Frank, Jr. packed up their father's things and placed them in the den of his house. She testified that they never found a will while packing up the house because they never looked for anything since there was "no need to."

Frank, Jr. testified that he and his father had a relationship that was complicated and strained at times. In 2000 or 2001, he recalled his father playing a game called, "You Get the Kingdom." At the time, Frank, Sr. asked for Frank, Jr.'s social security number and then wrote out a will leaving everything to Frank, Jr. Sometime after Katrina, Frank, Jr. got a call from Janene that their father had asked her for her social security number. Since that time, Frank, Jr. had not discussed his father's estate with him. Frank, Jr. testified that there were wills over the years, and he expected there to be a will made out to Sandy. He was not aware of the 2009 will until Ann filed her petition with a copy of the will attached.

After Frank, Sr. died and Sandy moved out of the house, Frank, Jr. testified that the siblings could not all agree on a time to clean out the house, so he and Janene went over to the house one day and spent about 6 hours boxing and bagging the house up. According to Frank, Jr., all the documents were boxed up and left there, except for the titles to the boat and truck, which he took. At no time did Frank, Jr. observe an original or a copy of a will, and he never removed a will from the house. When asked if they performed a specific search for a will, he testified that as they boxed things up, they could see what everything was because everything was labeled in folders. He testified that there was no folder for "will." He and Janene never performed an inventory of the safe.

In its oral reasons for judgment, the trial court stated:

> … That being said, the presumption still lies that when the original will can't be found at the time of the testator's death, that presumption must be overcome by clear proof. There is testimony, there is evidence in this matter that would certainly suggest, if not indicate that Mr. Messina intended to change the dispositions in the will that have been submitted into evidence in this particular matter. His comments to Sandy Messina, his comments to Janeen [sic] Allen -- Messina Allen, both were indicative of the fact that he had intent to take care of Sandy Messina at the time of his death in terms of either granting her usufruct over the family home or otherwise. There is also historical comments from some of the witnesses along the way that certain different parties were originally given everything by Mr. Messina subsequently to have Mr. Messina change his wishes and give other parties everything. Again, there are no wills to that effect that the Court can look at, other than the testimony that's been offered here today.

> So it would not seem uncommon that Mr. Messina, based upon his history and based upon the testimony, may have, in fact, intended to modify the will that has been offered for probate into the court record in this matter. That will was done some time ago. I think 2009 is when it was sent to Ms. Ann Messina -- and I apologize, ma'am, if I have your last name -- Ms. Ann Carman, excuse me -- Ms. Ann Carman, but that will was sent to her some time ago. Subsequent to that, a number of things changed in Mr. Messina's life that may have caused him to change the provisions of that will and the donations provided for in that will, the most significant of which I think is the fact that he ultimately married, with no disrespect to anyone, the person who could probably best be considered the love of his life, as that relationship was ongoing from the time they were both very young until the time that he died.

22-CA-172                                     8

All that being said, if there is any proof, I think the proof would lie towards suggesting that Mr. Messina did, in fact, intend to revoke that other will where everything was given to one of his children and to the exclusion of his current wife. Certainly, there is not enough proof to rebut the presumption by clear proof that the will wasn't destroyed without intent. I think it is perfectly plausible, given the times that we were in, that Mr. Messina took the first step in an effort to revoke the previous will by destroying the original and just never got around to redoing or completing a new will, completing his intent to give certain portions of his property to Ms. Sandy Messina. I don't think that is far-fetched at all, especially given the comments that he made to the various witnesses who testified in court here today.

So, with all that being said, I think that the -- or I'm going to rule that the mover failed to carry its burden of proof in this matter and did not provide sufficient clear proof that would necessitate the rebuttable presumption of finding that the testator, in fact, destroyed the will in an effort to revoke it. So, for those reasons, I'm ruling in favor of the succession representative in this matter.

It is uncontested on appeal that Frank, Sr. executed a valid olographic testament on February 2, 2009, a copy of which was attached to Ann's petition. Thus, the first two requirements for rebutting the presumption of revocation—(1) that the testator made a valid will, and (2) the contents or substance of the will—have been met. That leaves us to determine whether Ann has met the third requirement for rebutting the presumption of revocation—that the will, though not found at the testator's death, was never revoked by the testator. As such, this Court's inquiry is whether the trial court was clearly wrong or manifestly erroneous in finding that Ann failed to show by "clear proof" that Frank, Sr. did not revoke the subject will.

Upon review, considering the record in its entirety, we cannot say that the trial court was manifestly erroneous in finding that Ann failed to meet her burden of clearly proving that the subject will was not revoked. The evidence established that Frank, Sr. sent Ann a copy of a 2009 hand-written will leaving everything to her. An original of this will has never been located, either before or after Frank, Sr.'s death. Both Sandy and Frank, Jr. testified that Frank, Sr. was meticulous with his documents and very well organized. Though a copy of a will was found while

Frank, Sr. was in the hospital, neither Janene nor Sandy could say that it was the same will that is presently under review before this Court. Frank, Sr. did express that he planned to leave everything to Ann. However, he also later expressed to both Sandy and Janene that he intended to leave Sandy a usufruct and provide for her after his death. All things considered, we find that the trial court's determination that Ann failed to meet her burden of clearly proving that the 2009 will was not revoked was not unreasonable, not manifestly erroneous, and is supported by the record. This assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court denying Ann Messina Carman's Petition to File and Execute Olographic Testament and to Appoint Dative Independent Executor and finding that Frank Anthony Messina, Jr. shall remain the duly appointed administrator of the succession is affirmed.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
INTERIM CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**NOVEMBER 30, 2022** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL
PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

## 22-CA-172

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN C. GREFER (DISTRICT JUDGE)
RYAN S. MCBRIDE (APPELLEE)

**MAILED**
LAUREN K. MARQUETTE (APPELLANT)
R. SCOTT BUHRER (APPELLANT)
ATTORNEYS AT LAW
3017 21ST STREET
SUITE 110
METAIRIE, LA 70002