641 So.2d 981 (1994)
Tom R. HAMILTON, Plaintiff-Appellant,
v.
Hazel KELLEY, et al., Defendants-Appellees.
No. 25820-CA.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1994.
*983 Richard R. Storms, Ruston, for plaintiff-appellant.
Kitchens, Benton, Kitchens & Warren by Graydon K. Kitchens, III, Minden, Davenport, Files & Kelly by Michael J. Fontenot, Hudson, Potts & Bernstein by W. Craig Henry, Monroe, Earl and Hampton by Bruce E. Hampton, Farmerville, for defendant-appellee.
Before NORRIS, LINDSAY, HIGHTOWER, VICTORY and BROWN, JJ.
BROWN, Judge.
Plaintiff, Tom R. Hamilton, was ten years old when his uncle, W.H. Hamilton, died. The five brothers and sisters of Hamilton, including plaintiff's father, claimed that he died intestate and obtained a judgment placing themselves in possession of decedent's property. Twenty-five years later, plaintiff's father, Boyce Hamilton, died. Plaintiff found among his father's effects an olographic testament written by his uncle, W.H. Hamilton, bequeathing all of his property to plaintiff. The testament was entirely written and dated by W.H. Hamilton; however, the signature was obviously and purposely cut off the document. Within one year of discovering the testament, plaintiff filed this action to annul the judgment of possession because of fraud and ill practices and to probate the olographic testament. See LSA-C.C.P. Art. 2004. Although finding that the testament was entirely written and dated by W.H. Hamilton and that it had been signed, the trial court "reluctantly" found that plaintiff did not prove the authenticity of the missing signature and dismissed plaintiff's action "based on a strict and narrow interpretation of the law." For the following reasons, we reverse and render judgment in plaintiff's favor.

FACTS/PROCEDURAL HISTORY
W.H. Hamilton was never married and died without ascendants or descendants on November 15, 1963. His brothers and sisters, asserting that W.H. Hamilton died intestate, obtained a judgment giving them possession of his estate on September 11, 1964. His estate consisted primarily of land inherited from his parents, including an undivided 1/6th interest in 640 acres in Union Parish, a 20 acre tract in Union Parish (his parents' homeplace) and an undivided 1/12th interest in a lot in Dubach, Louisiana.
After the death of Boyce Hamilton (plaintiff's father) in December 1990, plaintiff found in his father's belongings the olographic testament of his uncle, W.H. Hamilton. The will was entirely handwritten and dated by testator on a small blue piece of paper. The right bottom corner containing the signature had been cut off the testament. The will made plaintiff, who at the time of his uncle's death was 10 years old, the sole beneficiary. The intact portion of the testament read as follows:
To: Whom it may concern;
I, William Henry Hamilton, being of sound mind, declares this as my last and only will. In the event and at the time of my death, I bequest and will everything I own to my brother's son, Tom Hamilton.

Signed this 4th day of March 1962.
On May 3, 1991, Tom R. Hamilton filed this action to annul the 1964 judgment of possession and to probate the olographic will. Named as defendants were W.H. Hamilton's *984 living sisters and the heirs of his deceased siblings. Plaintiff's petition alleged that W.H. Hamilton's brothers and sisters cut off the signature of the instrument to defraud plaintiff of his inheritance. Exceptions of prescription, no right/cause of action and res judicata were referred to the merits and overruled. A third party demand filed by defendants against the heirs of Boyce Hamilton (not including plaintiff) was voluntarily dismissed with prejudice.
W.H. Hamilton had five brothers and sisters. At the time of trial, two brothers, Boyce and Alton Hamilton, and one sister, Gordie Mosely, were deceased. Another sister, Opal Murray, was living in New York, but was physically unable to attend the trial. Viola Hamilton, the widow of Alton, testified on plaintiff's behalf. Hazel Kelley, the remaining sister, testified on behalf of the defense.
Plaintiff testified that his parents were Boyce Henry Hamilton and Rita Tabor Hamilton. He stated that his uncle, William Henry Hamilton, was his father's youngest brother. His uncle was never married nor did he have any children. Plaintiff's testimony was supported by documents filed in the record of W.H. Hamilton's succession. Plaintiff's father died on December 30, 1990, and in early 1991, plaintiff discovered the testament of his uncle while sorting through his father's papers. Plaintiff had no knowledge of the document prior to this time.
Viola Hamilton testified that when W.H. Hamilton died, her husband, Alton, who was in bad health, was concerned about dissension among his siblings caused by the will. Viola testified that she was present during a conversation between Boyce and Alton concerning the testament and heard Boyce's statement to Alton that he would invalidate the will by cutting off the signature. She witnessed Boyce cut the signature off the will and give it to Alton. She saw Boyce fold the remaining testament and put it in his pocket. She observed Alton place the signature part in his "business drawer" and state that he "didn't have the heart to destroy it." Viola further testified that Hazel Kelley came over the next day and got the signature part out of the drawer. She told Hazel to put it back, but she would not. She never told her husband, who died eight months later, that Hazel took the signature. Viola testified that she saw the document and that it was entirely written, dated and signed by W.H. Hamilton.
Hazel Kelley testified that W.H. Hamilton, her youngest brother, died in 1963. Hazel Kelley testified that she was much older than W.H. Hamilton and that she took care of him like her own child. Hazel Kelley testified that after W.H. Hamilton died, she and her sister, Gordie, went through his billfold. She saw Boyce later that same day and he requested the billfold for a keepsake. She testified that Boyce left with the billfold but returned about two hours later. Boyce stated to her that he had found W.H. Hamilton's will in the billfold. Boyce then showed it to Hazel Kelley and several others who viewed the will for the first time.
Hazel Kelley stated that she saw the will and the signature. At trial, she testified that the handwriting on the exhibit was "too neat" to be that of W.H. Hamilton, "but it looks like his." Hazel Kelley testified that she thought the writing on the will was that of W.H. Hamilton's, but that the signature she saw was not. She admitted that the document had a signature purporting to be W.H. Hamilton's, but that she knew his writing as well as her own and that it was not his signature. She denied seeing the document again after it was first shown to her by Boyce. Hazel Kelley testified that she signed the affidavit of heirship stating that W.H. Hamilton died intestate because their lawyer stated that the signature was not W.H. Hamilton's. (emphasis added).
Aubrey Ray, a good friend and lifelong neighbor of W.H. Hamilton, testified that one day at W.H. Hamilton's home, he observed W.H. Hamilton writing on a blue piece of paper and was told that it was his will. Hamilton further told Ray that he was leaving everything to Boyce's boy, Tom, because Tom was the only grandchild with the Hamilton surname.
James Marvin Simpson testified that he and W.H. Hamilton were like brothers and that Hamilton told him that he wrote a will *985 leaving everything to his nephew, Tom, because Tom was the only grandchild with the Hamilton surname. Simpson admitted that he never saw the will.
Robert Foley, a forensic document examiner, did not testify because the parties stipulated that he would testify in accordance with his written report and addendum. Foley, who holds master's degrees in chemistry and criminal justice, as well as a juris doctor degree in law, is widely recognized as a questioned document examiner. Foley concluded, from known samples, that W.H. Hamilton was the writer of the testament (minus the signature) at issue.
After considering all the testimony, the trial court found:
In this case, there is not a question of the testator's intent. Most significant is that the will which reflects the intent of the testator was written by him. This fact was uncontradicted.
The trial court's determination was clearly correct. No one seriously contested the intent of W.H. Hamilton to leave his property to his nephew, Tom. Further, the trial court determined that the testament was entirely written and dated by W.H. Hamilton. A letter from Opal Murray to Boyce Hamilton, also found among Boyce's papers, was placed into evidence. This letter, with its envelope postmarked December 22, 1963, confirmed the existence of the will as well as the dissension among the siblings over the contents of the will. The letter stated as follows:
As far [sic] the slip of blue paperBoyce I can't believe W.H. meant it that way and I don't think he remembered he had it in his billfold ... as far [sic] that will Boyce, you were the only one who knew anything about it and you yourself said you had told him you would not accept it because you did not think it was right. You also said that if everyone was not happy with it you would burn it. I can't understand how you could expect anyone to be happy about it. What if it had been someone else? How would you feel?
Hazel Kelley testified that she saw the will and that it contained a signature. The trial court stated that:
... [T]he court is firmly convinced that the testator's intent was to give his property to his nephew, Tom Hamilton. The court is further convinced that a testament was written and dated in the testator's hand, directed toward that end. The only question which remains then, is whether the testament was signed by the hand of the testator.
The trial court then determined that:
In this case, there was no disagreement that the testament was originally intact and was signed with a handwritten signature. Viola testified that she saw the document in its original form and that it was entirely written, dated and signed in the handwriting of W.H. Hamilton. However, no testimony was elicited in regard to her familiarity with the handwriting of W.H. Hamilton. Hazel testified that she, too, had seen the document in its original form. She said that there was a handwritten signature but that it was not the signature of W.H. Hamilton. She stated that she cared for her younger brother for many years and was very familiar with his handwriting. There was no other evidence or testimony regarding the authenticity of the signature.
As is evident from the above excerpts, the trial court found the testament to be authentic, that the handwriting was that of W.H. Hamilton and that it contained a signature purporting to be W.H. Hamilton's. It found, however, that the missing signature had not been proven to be that of W.H. Hamilton.

DISCUSSION
In Succession of Nunley, 224 La. 251, 69 So.2d 33 (1953), a lost will was allowed to be probated. Nunley recognized the rule that a testator is presumed to have destroyed a will which had been lost before his death. This presumption can be overcome by proof (1) that the testator made a valid will, (2) of the contents of the will, and (3) that the will was never revoked by any act of the testator.
*986 The trial court found and the record clearly supports that W.H. Hamilton intended to leave his entire estate to plaintiff. This intent is stated in the document itself and confirmed by Hamilton's two close friends. Further, all the testimony demonstrates that Hamilton did not revoke the olographic testament. Viola Hamilton and Hazel Kelley testified that the destruction of the will, by excising the signature, occurred after W.H. Hamilton's death. Thus, the remaining issue concerns the sufficiency of proof that a will in valid form existed. The trial court's ruling concerning the existence of a valid testament focused on the excised signature.
In order to be a valid olographic testament, it must be entirely written, dated and signed by the hand of the testator. It is subject to no other form and may be made anywhere, even out of the state. LSA-C.C. art. 1588. Erasures not approved by the testator are considered as not made, and words added by the hand of another as not written. LSA-C.C. art. 1589. The proponent of an alleged olographic will has the burden of proving that it was entirely written, dated and signed by the testator. LSA-C.C.P. art. 2903.
Tom R. Hamilton produced three witnesses and offered the report of Robert Foley, a handwriting expert, to prove the validity of W.H. Hamilton's olographic testament. Viola Hamilton testified that the handwriting which appeared on the testament was that of W.H. Hamilton. She also testified that the signature which, before it was cut off the paper, appeared at the end of the testament, was that of W.H. Hamilton. Furthermore, Viola Hamilton testified that she overheard Alton and Boyce Hamilton talking about the will and discussing W.H. Hamilton's signature. In her testimony, the following was revealed:
Q. What do you remember they said?
A....[W]hat was said was that Boyce talked to Alton about that he had talked to a lawyer and the lawyer had told him if he cut the name offthe signature off of that will it would be invalid.
Plaintiff argues that although Boyce was not alive to testify at trial, his actions, specifically his wanting to remove the signature, apparently believing it to be authentic, prove the authenticity of W.H. Hamilton's signature. Plaintiff argues that the conversation between Alton and Boyce Hamilton should have been considered as recognition that the will had been signed by W.H. Hamilton. Plaintiff argues that the testimony of Viola Hamilton as to what Alton and Boyce said and did are exceptions to the hearsay exclusions. See LSA-C.E. art. 804(B)(3) & (6). Plaintiff concludes that the testimony of Viola, Alton and Boyce establishes that W.H. Hamilton did indeed sign the will.
Aubrey Ray testified that he observed W.H. Hamilton writing on a blue piece of paper. He inquired as to what W.H. Hamilton was writing and Hamilton replied "a will" leaving his property to plaintiff. James Marvin Simpson testified that Hamilton told him that he wrote a will leaving everything to Tom R. Hamilton because he was the only grandchild with the Hamilton surname. However, Simpson admitted that he never saw the will.
We find that the testimony of Viola Hamilton, Aubrey Ray and James Marvin Simpson, coupled with the report of Mr. Foley, the handwriting expert, and all the other evidence presented, specifically the letter sent to Boyce Hamilton from Opal Murray postmarked December 22, 1963, sufficiently establishes the authenticity of the will. This is in agreement with the trial court's finding that the writing on the will was that of W.H. Hamilton.
The fact that a third party removed the testator's signature does not, ipso facto, render the will invalid. In the absence of a showing that the signature was removed pursuant to the testator's request to revoke the will, the removal of the signature is ineffective in law. The removal of a testator's signature by a third party cannot operate to invalidate the olographic testament. See Rivette v. Moreau, 341 So.2d 459 (La.App. 3d Cir.1976).
At trial, Hazel Kelley testified that she knew W.H. Hamilton's writing like her own and that while the document shown to her in 1963 contained a signature purporting to be W.H. Hamilton's, she knew it was not his. *987 In a motion for new trial, plaintiff argued that the trial court erred in finding credible the testimony of Hazel Kelley. In support of the motion for new trial, the pre-trial deposition of Hazel Kelly was submitted, which in part contradicted her trial testimony.
The trial court ruled that, "assuming that Mrs. Kelley's testimony at trial was untrue, the court cannot state that its inability to find Mrs. Kelley a credible witness will affirmatively establish the signature of W.H. Hamilton at the end of the olographic testament in accordance Louisiana Code of Civil Procedure article 2883." Whether Hazel Kelly's pre-trial deposition was allowed into evidence is unclear; however, its consideration is unnecessary.
Code of Civil Procedure article 2883 dictates that an olographic testament be proven by the testimony of two credible witnesses. In the instant case, the testimony of Viola Hamilton, Robert Foley, Aubrey Ray, James Simpson, and Hazel Kelley and the submitted documents adequately established that an olographic testament in valid form was made by W.H. Hamilton. Only Hazel Kelley's testimony questioned whether W.H. Hamilton actually signed the document and that testimony was discredited by her complicity in the removal of the signature at the bottom of the document and the concealment of the testament. Further, defendant, Opal Murray, did not testify. Although evidence indicated that she was unable to attend the trial due to a broken hip, her testimony could have been taken by deposition. Thus, the circumstantial evidence convincingly showed that W.H. Hamilton wrote, dated and signed the olographic testament.
Further, the law clearly imposed on the brothers and sisters of W.H. Hamilton the duty to present the olographic testament to the court. LSA-C.C.P. Art. 2853. If it was in fact invalid, the court could have so found. Rather than presenting the testament to the court, they concealed it and excised the signature from the document. Their obvious intent was to deny plaintiff the ability to prove the testator's signature.
Thus, by their acts, the brothers and sisters of W.H. Hamilton attempted to circumvent his clear intent and deprive plaintiff of the inheritance. Their actions speak louder than words that the testament was entirely written, dated and signed by W.H. Hamilton. We should not allow these siblings to profit by their wrongful deeds. See Standard Life & Accident Insurance Co. v. Pylant, 424 So.2d 377 (La.App. 2d Cir.1982), writ denied, 427 So.2d 1212 (La.1983). Because plaintiff clearly proved the testator's intent and the execution of a will to achieve that desire, it should fall upon those who acted to remove the signature for their personal gain to prove that the excised signature was not the testator's. Hazel Kelly's testimony at trial, in light of her participation in the scheme to destroy and hide the will, is insufficient to carry that burden of proof.
Defendants have reurged their exception of prescription under LSA-C.C.P. Art. 2893. The trial court correctly denied this exception. Under the doctrine of contra non valentem, as well as, LSA-C.C.P. Art. 2004, plaintiff had one year from discovery of the testament to institute this action. It was not the legislative intent in adopting Art. 2893 to place it within the power of heirs ab intestato, who have obtained possession of a testament, to deprive a legatee of his rights by fraudulently concealing the existence of the testament. See Fuller v. Qualls, 241 Ala. 673, 4 So.2d 418 (1941).
Under the facts of this case, the evidence precludes any other reasonable inference except that the will was signed by the testator. Accordingly we reverse the trial court ruling, annul the judgment of possession and order the testament in olographic form to be probated. Costs are assessed to defendants.
REVERSED and REMANDED.
LINDSAY, J., concurs in the result.
HIGHTOWER, J., dissents and assigns written reasons.
VICTORY, J., dissents.
HIGHTOWER, Judge, dissenting.
Have we come to the point where the writing of laws is completely in vain?
*988 Shrouding itself under the banner of circumstantial evidence, the majority simply ignores the express requirement of LSA-C.C.P. Art. 2883 that an olographic will "must be proved by the testimony of two credible witnesses that the testament was... signed in the testator's handwriting...." Such wording is plain as day and can be understood by the average high-schooler!
Insofar as our record, seven individuals (at most) saw the subject document intact: Boyce; Alton; Gordie; Armand Rabun, the attorney; Opal; Viola Hamilton, the sister-in-law; and Hazel. The first four are deceased and, apparently unnoticed by the majority, cannot present their "testimony" as "witnesses."
Viola, without any determination of her familiarity with the decedent's handwriting, testified that the instrument bore William Henry Hamilton's signature. Hazel, who stated she cared for her younger brother for several years and "knew his handwriting as well as I do my own," repeatedly and categorically testified that the handwritten name on the document was not that of W.H. Hamilton. Opal, who has a broken hip and lives in New York, did not testify.
In short, we are left with only one witness identifying the signature. Furthermore, even that individual's familiarity with W.H.'s handwriting and signature is questionable. This, quite obviously, does not conform to the requirements of Article 2883.
It never ceases to amaze, in the vernacular, "when push comes to shove," how otherwise assumed logicians can be convinced, and will indeed announce, that Night is Day, Empty is Full, and, in the present case, One is Two. Such legerdemains at the hands of the law somehow always trouble those outside our professional ranks. If we are simply intent upon producing a certain outcome irrespective of existing statutes, can that fact not at least be forthrightly so stated?
The whole framework of the law, its certainty and reliability, suffer when judicially fashioned results disregard the written word, and spring merely from a desire of judges to "do good."
I respectfully dissent.
VICTORY, Judge, dissenting.
The prime issue on appeal is if the missing signature on the purported will was that of W.H. Hamilton. After reviewing the testimony and other evidence presented, the trial court concluded that the proponent, Tom Hamilton, failed to prove that the signature was genuine. The trial court's ruling is supported by substantial evidence, is not clearly wrong, and should be affirmed.
Only two witnesses who saw the document intact testified at the trial. Hazel Kelly testified that she was as familiar with the handwriting of her brother, W.H. Hamilton, as her own and that the signature on the purported will was not his. Although Viola Hamilton stated that her brother-in-law wrote and signed the purported will, the trial court in his written opinion noted that Viola Hamilton was not examined with regard to her familiarity with the decedent's handwriting.
The record does not support the majority's contention that other witnesses proved the signature was genuine. The handwriting expert, Robert Foley, could not say W.H. Hamilton signed the will, because the signature had been removed years before he saw it. Aubrey Ray was unable to even identify the document in question as the blue piece of paper that he saw W.H. Hamilton writing on years ago. James Simpson could not identify the document as W.H. Hamilton's will because he never saw a will at all, much less the signature that had been removed.
Further, the record shows that the genuineness of the will was questioned at the time the succession was filed. In his written opinion, the trial judge quoted Viola Hamilton's testimony to the effect that Hazel Kelley questioned the handwriting and stated the handwriting might be analyzed to determine if it was that of W.H. Hamilton. The trial court placed great significance on the fact that the purported will was not probated by Mr. Armand Rabun (the trial judge characterized him as a well-respected attorney, now deceased), and that Mr. Rabun notarized the affidavit of intestacy of W.H. Hamilton. He clearly did not believe Mr.
*989 Rabun would have taken such actions if Rabun had thought the signature was genuine. Hazel Kelley testified that when she asked Mr. Rabun at the time the succession papers were being signed why the purported will was not being probated, he told her the signature on the will was not that of W.H. Hamilton, i.e., it was a forgery.
The record shows it was the plaintiff's father, Boyce Hamilton, who found the purported testament, took it to Mr. Rabun for examination, and received the will back after it had remained in Rabun's office for eight months. Plaintiff's father then cut the signature off the will, and signed an affidavit that W.H. Hamilton died intestate.
After all of this evidence is considered, I cannot say the trial court was clearly wrong in holding that Tom Hamilton failed to prove the purported will was signed in the testator's handwriting as required by LSA-C.C.P. Art. 2883. There is evidence suggesting that the will was valid; however, there is substantial evidence suggesting that the signature on the will was forged. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be erroneous or clearly wrong. Stobart v. State of Louisiana, DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989).
I respectfully dissent.