SUCCESSION OF LOY L. OLSEN, JR.

NO. 19-CA-348

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 768-260, DIVISION "H"
HONORABLE GLENN B. ANSARDI, JUDGE PRESIDING

January 29, 2020

**HANS J. LILJEBERG**
**JUDGE**

Panel composed of Judges Marc E. Johnson,
Robert A. Chaisson, and Hans J. Liljeberg

<u>**AFFIRMED**</u>

**HJL**
**MEJ**
**RAC**

COUNSEL FOR PLAINTIFF/APPELLEE,
DAVID DAVENPORT AND PHYLLIS DAVENPORT, INDIVIDUALLY AND AS
ADMINISTRATORS OF THE SUCCESSION OF LOY L. OLSEN, JR.
    M. Elizabeth Bowman
    Christy M. Howley

COUNSEL FOR INTERVENOR/APPELLANT,
REBECCA CREPPEL AND PAUL ALEXANDER
    Harold E. Molaison
    Justin E. Molaison
    Warren E. Mouledoux, Jr.
    Jack E. Morris

**LILJEBERG, J.**

In this succession proceeding, intervenors seek review of the trial court's April 22, 2019 amended final judgment, dismissing their claims after finding that they failed to carry the burden of proof necessary to probate an olographic will and that the succession rights under the decedent's notarial will are governed by the law existing at the time of his death. They also seek review of the trial court's September 15, 2018 judgment denying their motion for partial summary judgment on the issue of whether the decedent's estate must devolve intestate since all legacies in the notarial will have lapsed. For the following reasons, we affirm both judgments.

## FACTS AND PROCEDURAL HISTORY

Loy Lee Olsen, Jr. died on December 11, 2016 at the age of seventy-three. He did not have any children and his mother and father predeceased him. He had a sister, Loydella Olsen Davenport, and a half-sister, Lynn Olsen Rizzo. Loy was married once to Jane Ellen White Olsen.

On December 5, 1994, Loy executed a last will and testament in notarial form in which he bequeathed all of his property to his wife, Jane Ellen White Olsen. The testament also provided that in the event that Jane predeceased him or died simultaneously with him, he bequeathed all of his property to his sister, Loydella Olsen Davenport. Jane passed away on June 29, 2012 and Loydella passed away on May 16, 2008. Therefore, since they both predeceased Loy, no legatees under the 1994 notarial will remained at the time of Loy's death. Although Lynn survived Loy, she died just a few days later on December 17, 2016.

Loydella had two children, Phyllis and David Davenport. Lynn also had two children, Rebecca Creppel and Paul Alexander. On January 18, 2017, Phyllis and David filed a "Petition to Probate Will, Open Succession, and to Place Under Independent Administration," along with a photocopy of Loy's 1994 notarial will

and an affidavit of the attorney and notary who prepared the will, attesting to its authenticity. In their petition, Phyllis and David indicated that they would attempt to locate the original 1994 notarial will. In accordance with Phyllis and David's requests in their petition, the trial court signed an Order on January 18, 2017, ordering that the 1994 notarial will be probated, that the succession be opened, and that Phyllis and David be named as co-independent administrators of the succession.

On March 29, 2017, Rebecca and Paul filed a "Petition to Annul Probated Testament and to Probate Later Dated Testament," along with the original of an olographic will purportedly executed by Loy on November 25, 2016. This olographic will named Amos Cormier III as the executor, indicated that previously signed wills were revoked, and further provided:

> I LEAVE $25,000 TO MACK CORMIER MY GODCHILD
> I LEAVE $25,000 TO ASPCA
> I LEAVE $20,000 TO SUE CHURCH MY DEAR FRIEND
>
> AS TO THE REST OF MY ESTATE I LEAVE TO DAVID
> DAVENPORT NEPHEW, PHYLLIS DAVENPORT NIECE
> REBECCA CREPPEL NIECE AND PAUL ALEXANDER
> NEPHEW TO BE DIVIDED EQUAL

In Rebecca and Paul's petition, they alleged that on March 17, 2017, an envelope was anonymously dropped off to a receptionist at the law office of Warren Mouledoux, who had been retained by Rebecca and Paul. In the envelope was the olographic will that had been "crumpled." The petition indicates that an anonymous message was attached to the will stating that it had been retrieved from the trash bin of a friend of the co-administrators and that it was authentic. An affidavit of two witnesses, Mack Cormier and Susan Church, attesting that the will was entirely written, dated and signed in Loy's handwriting, was included with the petition.

On March 29, 2017, the trial court signed an Order prohibiting the co-administrators, Phyllis and David, from disposing of any contents of Loy's residence or assets of his estate, and ordering them to show cause at a hearing why the 1994 notarial will should not be declared revoked and why the 2016 olographic will should not be admitted to probate.

On June 16, 2017, Phyllis and David filed an "Answer and Opposition to Probate of Olographic Testament," in which they challenged the authenticity of the will and noted that the two witnesses attesting to its authenticity were both named as legatees in this purported will. On this same date, Phyllis and David filed a "Supplemental Petition to Probate Notarial Will" indicating that the original 1994 notarial will had been located and attaching it thereto. On June 19, 2017, the trial court signed an Order requiring Rebecca and Paul to show cause at a hearing why the original 1994 notarial will should not be probated. On March 29, 2018, Rebecca and Paul filed a "First Amended Petition (Action for Declaratory Judgment)," asserting that in the event the 1994 notarial will was not revoked, Loy's estate would devolve intestate since the legacies provided for therein have lapsed.

On July 31, 2018, Rebecca and Paul filed a "Motion for Partial Summary Judgment on the Issue of Intestacy," seeking a declaration that, in the event that the 1994 notarial will survives revocation by the 2016 olographic will, Loy's estate would devolve intestate unto Rebecca, Paul, Phyllis, and David. Phyllis and David filed a memorandum in opposition to the motion for partial summary judgment, arguing that the law does not support the relief requested by Rebecca and Paul. After a hearing, the trial judge denied the motion for partial summary judgment and signed a judgment to that effect on September 15, 2018.

A bench trial was held on October 16, 2018, October 29, 2018, December 4, 2018, and January 28, 2019. At trial, Stephanie Schieffler testified that she is a notarial legal secretary and receptionist for the law office of Warren Mouledoux, Jr. She testified that a lady dropped off an envelope at the office in March of 2017 and indicated that she was leaving it for Mr. Mouledoux. However, the lady did not identify herself or provide any further information. Within an hour, Mr. Mouledoux came into the office and she gave him the envelope.

Warren Mouledoux, Jr. testified that he is one of the attorneys representing Rebecca and Paul. He first saw the 2016 olographic will when someone dropped it off in an envelope at his office on March 17, 2017. He stated that the olographic will was "crumpled up" and agreed there was a note attached indicating it was "found in the trash of Phyllis' friend."[1]

Roland "Jimmy" Broussard testified that he had known Loy since they were children and they were "pretty close." According to Mr. Broussard, he had a conversation with Loy about a month before he died in which Loy talked about making a will and indicated he was thinking of making Amos Cormier the executor. Mr. Broussard testified he was not sure if Loy ever wore a hand brace.

Amos Cormier, III, testified that he had known Loy all of his life because his father and Loy were very good friends and that Loy was the godfather of his brother, Mack Cormier. According to Amos, Loy spoke with him around November of 2016 and asked Amos to make a will for him. Amos responded that he did not have time to make a will because he was in the middle of a political campaign, but he told Loy that he knew other attorneys who could help him. Amos also informed Loy that he could write his own olographic will by writing,

---

[1] When counsel for Rebecca and Paul moved to admit the note into evidence, counsel for Phyllis and David objected on the grounds of foundation and hearsay. The trial court sustained the objection and did not admit the note itself into evidence.

signing, and dating it in his own handwriting, and that Amos could "make it into a statutory, a form will" after the election. Amos stated that Loy indicated to him that he wanted to leave something to his friend, Sue Church, and to Amos' brother, Mack. At a later date, Loy asked Amos if he would be the executor of his succession.

Amos also testified that Loy would complain about his health issues, including pain in his hands, and that he had seen Loy wear a hand brace. Amos testified that he has a general idea of Loy's handwriting, because he has seen things written in his handwriting once or twice, such as a $500 check Loy wrote to Amos' campaign on November 25, 2016, which is the same date the purported olographic will is dated. Amos testified that the $500 check and the olographic will both appear to be written in Loy's handwriting.

Mack Cormier testified that Loy was his godfather. Around Thanksgiving of 2016, he had a conversation with Loy and Amos during which Loy indicated that he wanted Amos to make a will for him and to be the executor of his succession. According to Mack, Loy did not indicate what he wanted to put in his will or state that he wanted to leave anything to Mack, but it was Mack's understanding that Loy was going to leave him something because Loy asked Mack's mother for the legal spelling of his name and his social security number. Mack testified that Loy was not in good health for several months before he died, had problems with his foot, and had an issue with his hand or wrists causing him to wear a hand brace. Loy would wear the brace occasionally and he left it at Mack's house one time. Mack testified that he has seen Loy's handwriting on some documents, including a note to Susan Church and several receipts that were handwritten and signed by Loy. He indicated that he recognized the 2016 olographic will as being in Loy's handwriting.

Susan Church testified that she met Loy about four years ago and they became good friends. He did not talk to her about what he would do with his estate when he passed away, but he often spoke about Amos and Mack and he had a fondness for animals. Ms. Church testified that Loy lent her money several times and she signed "IOUs" or receipts that were handwritten by Loy. She further indicated that Loy had problems with diabetes and with his wrists, knees, and feet. She saw Loy wear a hand brace and stated that he always had one with him in case his wrist started hurting. Ms. Church testified that she was familiar with Loy's handwriting, and she recognized the olographic will as being in his handwriting.

Ronald Thibodeaux testified via video deposition that he is an attorney and that Loy Olsen had been his client. He had no independent recollection of speaking with Loy about making a will, given that the 1994 notarial will was prepared over twenty years ago, but he stated that they obviously did since it appears he prepared and notarized the 1994 notarial will. He indicated that he would typically discuss potential issues with his client and answer succession questions. It does not appear Loy gave him any direction regarding what to do in the event Jane and Loydella both predeceased him, because such a situation is not addressed in the will.

David Davenport testified that Loy was his uncle and that he had taken the lead in the administration of his estate. When cleaning out Loy's house, he did not find the purported olographic will. He stated that he and Loy used to write cards and send them to each other over the years, so he is familiar with Loy's handwriting. David does not believe the olographic will was written by Loy. He noted what he believed to be discrepancies in the handwriting and also that the will refers to David before Phyllis, which he stated Loy would never do because Phyllis was older and he always referred to them in birth order. David testified that Loy

never told him that he had issues with his hands and needed a brace, and no hand brace was found when they cleaned out his house and vehicles.

Paul Alexander testified that Loy was his uncle and he used to do "little handy work" for him. He stated that he has seen Loy's handwriting quite a few times and would recognize it. Paul testified that the signature on the olographic will "really looks like" Loy's handwriting.

Rebecca Creppel testified that Loy was her uncle. According to Rebecca, during one of their conversations, he spoke about his will and mentioned he would leave some money to Rebecca, Paul, his Godchild, and the SPCA. Rebecca testified that she has carpal tunnel syndrome and wears a hand brace. She stated that she occasionally saw Loy wearing a similar brace. Rebecca admitted that she did not see Loy write or sign anything with the brace, but she stated that when she wears her brace, it restricts her writing and affects her penmanship. She stated that she is familiar with Loy's handwriting and signature because she has seen samples of his handwriting, and the olographic will appears to be in his handwriting.

Brenda Johnson testified that Phyllis and David are her cousins and she helped to clean out Loy's house after his death. She stated that she did not find the olographic will in Loy's house or attempt to destroy it or throw it away, and she did not see that Phyllis found it or attempted to destroy it.

Phyllis Davenport testified that Loy was her uncle and that she became an administrator of his estate when he died. She stated that she did not find the olographic will in Loy's house, crumple it up, or throw it away.

Robert Foley was accepted as an expert in forensic document examination with a specialty in handwriting comparison. He examined several documents containing Loy's handwriting and compared them with the olographic will. Based on the comparative documents, Mr. Foley stated that it was his opinion that Loy

did not sign the olographic will. He stated that it was probable that Loy did not write or date the will either. He noted that the samples he reviewed were all in cursive or a combination of cursive and hand printing, with upper and lower case letters, whereas the olographic will was written in block printing with all capitals. Mr. Foley explained some of the differences noted between the olographic will and other documents, such as the check Loy wrote to Amos' campaign on the same date. He explained what he found to be differences in letters, sizing, speed and pen strokes, and style. Mr. Foley testified that if Loy wore a hand brace, he does not believe it would account for the discrepancies in the handwriting. He opined that although a hand brace can alter the appearance of a person's writing "a little bit," there were significant letter design differences.

Mr. Foley testified that prior to the issuance of his first report, he was not told that Loy may have used a hand brace. Mr. Foley admitted that he was aware prior to the issuance of his second report that there was an issue as to whether or not Loy wore a hand brace. However, he stated that he did not mention the brace in his second report because it was just a "hypothetical" that he used a hand brace and he did not have any samples of Loy's writing while wearing a hand brace to analyze or compare to the olographic will.

Mr. Foley testified that he believes it is improbable, though not impossible, for a hand brace to have impacted the signature on the will to make it look a little different. Based on the data he reviewed, Mr. Foley believes the olographic will is a simulation, meaning someone had known samples of Loy's handwriting and signature and tried to copy them.

On April 10, 2019, the trial court rendered a judgment finding that intervenors, Rebecca and Paul, failed to meet their burden of proof necessary to probate the olographic will dated November 25, 2016. The court also found that

the succession rights pertinent to the 1994 notarial will are governed by the law in effect at the time of Loy's death, including testamentary accretion per La. C.C. art. 1593, thereby leaving Phyllis and Davis as sole heirs. In its reasons for judgment, the trial court stated that "more likely than not, the olographic will was not that of the decedent." It noted that the intervenors and the lay witnesses who testified that they believed the olographic will had been written by Loy would all have benefitted from the probate of this testament. It further noted that the only expert testimony presented was that of Mr. Foley, who opined that Loy probably did not sign, date, or write the will, and believed the will was a simulation, meaning that someone tried to mimic the decedent's handwriting.

On April 22, 2019, the trial court issued an "Amended Final Judgment" adding decretal language providing that all of Rebecca and Paul's claims were dismissed with prejudice. Rebecca and Paul appeal both the April 22, 2019 amended final judgment and the September 15, 2018 interlocutory judgment denying their motion for partial summary judgment.

## LAW AND DISCUSSION

In their first argument on appeal, Rebecca and Paul contend that the trial court erred by dismissing their claims for a judgment declaring the 1994 notarial will revoked and by failing to admit the 2016 olographic will to probate. They argue that the testimony and evidence adduced at trial prove the validity of the olographic will. They further assert that the trial court erred in admitting irrelevant and prejudicial testimony about Rebecca and Paul's former non-testifying handwriting expert.

An olographic testament is one entirely written, dated, and signed by the testator. La. C.C. art. 1575. The only other requirement is that the document itself evidence testamentary intent. *In re Succession of Carroll*, 09-219 (La. App. 5 Cir.

12/8/09), 30 So.3d 11, 17. An olographic testament must be proved by two credible witnesses testifying that the handwriting on the instrument is that of the testator. La. C.C.P. art. 2883; *In re Succession of Plummer*, 37,243 (La. App. 2 Cir. 5/14/03), 847 So.2d 185, 188, *writ denied*, 03-1751 (La. 10/10/03), 855 So.2d 323; *Succession of Calhoun*, 28,233 (La. App. 2 Cir. 4/3/96), 674 So.2d 989, 990. The court must satisfy itself, through interrogation or from the written affidavits or the depositions of the witnesses, that the handwriting and signature are those of the testator. La. C.C.P. art 2883(A).

The proponent of an olographic will has the burden of proving its authenticity and its compliance with all of the formal requirements of law. La. C.C.P. art. 2903; *Hamilton v. Kelley*, 25,820 (La. App. 2 Cir. 8/17/94), 641 So.2d 981, 986, *writ denied*, 94-2338 (La. 11/18/94) 646 So.2d 388. In will contest cases, absent a finding of manifest error, the factual findings of the trial court are accorded great weight and will not be disturbed on appeal. *In re Succession of Caillouet*, 05-957 (La. App. 4 Cir. 6/14/06), 935 So.2d 713, 715, *writ denied*, 06-1732 (La. 10/6/06), 938 So.2d 85.

At trial, Rebecca and Paul had the burden of proving the olographic will was authentic. Paul, Rebecca, Mack, Amos, and Susan all testified that they were familiar with Loy's handwriting and that the olographic will and signature appeared to be in Loy's handwriting. We note, as did the trial judge, that each of these witnesses would benefit from a finding that the olographic will was authentic. An interest in the estate is not grounds for disqualification as a witness for purposes of La. C.C.P. art. 2883, but it is a factor affecting the credibility of the legatee's testimony. *Succession of Calhoun*, 674 So.2d at 991.

In opposition to Rebecca and Paul's claim that the olographic will was written, dated, and signed by Loy, David testified that he is familiar with Loy's handwriting and does not believe the olographic will was written by Loy. He

noted what he believed to be discrepancies in the handwriting and the order in which he and Phyllis were referenced in the will. Robert Foley testified that he did not believe the olographic will was written by Loy, based on samples of Loy's handwriting, including the check to Amos' campaign that was written the same date the olographic will was allegedly written. Mr. Foley testified that he believes the olographic will was a simulation, meaning that someone tried to mimic Loy's handwriting. Although Mr. Foley admitted that a hand brace could have affected Loy's handwriting somewhat, it was disputed whether Loy wore a hand brace. Further, Mr. Foley did not believe a hand brace would account for the discrepancies between the writing of the olographic will and Loy's writings.

The factfinder is required to assess the credibility of both expert and lay witnesses to determine the most credible evidence. *Johnson v. E.I. DuPont deNemours & Co., Inc.*, 08-628 (La. App. 5 Cir. 1/13/09), 7 So.3d 734, 741. Expert testimony is to be weighed the same as any other evidence, and the trier of fact has the discretion to accept or reject, in whole or in part, the opinion of an expert. *King v. Nat'l Gen. Assurance Co.*, 18-281 (La. App. 5 Cir. 12/12/18), 260 So.3d 1298, 1308. The strength of an expert's opinion depends upon his experience, knowledge, and skill, as well as the facts upon which his opinion is based. *Succession of Calhoun*, 674 So.2d at 990. The effect and weight to be given to expert testimony is within the broad discretion of the trial court. *Normand v. Cox Communications Louisiana, L.L.C.*, 14-563 (La. App. 5 Cir. 12/23/14), 167 So.3d 156, 163, *writ denied*, 15-158 (La. 4/10/15), 163 So.3d 815.

In the present case, the trial court weighed the testimony of the expert and lay witnesses, made credibility determinations, and chose to give more weight to the testimony of Mr. Foley, who did not believe the olographic will was written, dated, and signed by Loy. In its reasons for judgment, the trial court noted that Mr. Foley was accepted as an expert in forensic document examination, that he has

testified at least 500 times, and that he is certified by the American Board of Forensic Document Examiners, "which requires repeated written and practical examinations to retain one's certification." Based on the testimony and evidence presented, we cannot say the trial court manifestly erred by finding that the 2016 olographic will was not authentic and failing to admit it to probate.

Rebecca and Paul also argue that the trial court erred in admitting testimony about their former non-testifying handwriting expert, because it was irrelevant and the probative value of the testimony was "substantially outweighed by the danger of unfair prejudice." *See* La. C.E. arts. 401, 403. They claim that the trial court specifically relied on this testimony, because it noted in its reasons for judgment that Rebecca and Paul did not present any expert testimony to bolster their position, even though they had retained a handwriting expert at one point.

A trial court has wide discretion concerning the admissibility and relevancy of evidence, and a trial court's ruling will not be disturbed on appeal absent a clear abuse of discretion. *Succession of Davisson*, 50,830 (La. App. 2 Cir. 12/22/16), 211 So.3d 597, 604, *writ denied*, 17-307 (La. 4/7/17), 218 So.3d 111. On appeal, the reviewing court must consider whether the complained-of ruling was erroneous and whether the error affected a substantial right of the complaining party. La. C.E. art. 103; *Pratt v. Culpepper*, 49,627 (La. App. 2 Cir. 2/27/15), 162 So.3d 616, 621. If a party's substantial right was not affected by an evidentiary ruling, reversal is not warranted. The complainant has the burden of proof. *Id.*

On cross-examination, Rebecca was asked if she had retained a handwriting expert during this litigation and she indicated that she had not. She acknowledged that she had heard something about a handwriting expert being hired, but she did not think she and Paul had a handwriting expert to testify at trial. Counsel for Rebecca and Paul moved to strike the testimony related to whether they retained a handwriting expert, but the trial court denied their request.

There was no testimony regarding any findings of this handwriting expert, his qualifications, or the reason he was not called to testify at trial; rather, the testimony just reflected that an expert had been retained by Rebecca and Paul at some point. After review, we find the trial court did not abuse its discretion by finding the testimony in question was relevant and allowing it at trial. Further, we cannot say the probative value of this testimony was substantially outweighed by the risk of unfair prejudice.

Having determined that the trial court did not err by finding that Rebecca and Paul failed to prove the authenticity of the 2016 olographic will and by denying their request for a judgment declaring the 1994 notarial will revoked and admitting the olographic will to probate, we now consider what law applies to determine the effect of the 1994 notarial will.

On appeal, Rebecca and Paul assert that the trial court erred in denying their motion for partial summary judgment on the issue of intestacy and in dismissing their claim for a judgment declaring that Loy's estate devolves intestate. They argue there is no genuine issue of material fact that Loy intended for his estate to devolve intestate in the event all legacies in the 1994 notarial will lapsed, because that was the law at the time he executed this will. They argue that under La. C.C. art. 1611(A), the intent of the testator controls the interpretation of his testament. They also argue that the trial court erred by construing La. C.C. art. 1611(B) to require a finding of ambiguity in the will before a court can consider the law in effect at the time the will was executed in order to ascertain the testator's intent. Finally, Rebecca and Paul contend that the trial court erred by applying La. C.C. art. 1593 to the 1994 notarial will because it violates the provisions of La. R.S. 9:2440.

La. C.C. art. 870(B) provides that testate and intestate succession rights are governed by the law in effect on the date of the decedent's death. Pursuant to La.

C.C. art. 1589, a legacy lapses when the legatee predeceases the testator. La. C.C. art. 1590 provides that "[t]estamentary accretion takes place when a legacy lapses."

At the time of Loy's death and presently, La. C.C. art. 1593 provides that if a legatee is a sibling of the testator and the legatee's interest in the legacy lapses, accretion takes place in favor of the legatee's descendants by roots who were in existence at the time of the decedent's death.

The only legatees named in Loy's 1994 notarial will were Jane and Loydella, both of whom predeceased Loy. The record reflects that Jane did not have any descendants, but Loydella had two children, Phyllis and David. Pursuant to the law in effect at the time of Loy's death, testamentary accretion would apply herein, making Phyllis and David the sole heirs of Loy's succession.

Rebecca and Paul cite *In Re Succession of Gonzales*, 03-0823 (La. App. 4 Cir. 3/10/04), 868 So.2d 987, in support of their position that Loy's estate should devolve intestate because the intent of the testator at the time he executed his testament controls the interpretation of his testament.

In *Gonzales*, Dr. Gonzalez executed a testament in 1990 leaving his entire estate to his then wife and appointing her as executrix. At that time, there was no law providing that a legacy to one's spouse would not remain in effect after divorce. Subsequent to the execution of this testament, Dr. Gonzales and his wife divorced. Prior to Dr. Gonzales' death, in La. Acts 1997, No. 1421, the Louisiana Legislature enacted La. C.C. art. 1608(5), which provides for revocation of a legacy or other testamentary provision when the testator is divorced after the testament is executed and at the time of his death, unless the testator provides to the contrary. In *Gonzalez*, the Fourth Circuit declined to apply the provisions of La. C.C. art. 1608(5), which were in effect at the time of death, and found that the law in effect when the testament was executed was applicable. The Court cited La. R.S. 9:2440, which provides:

> A testament, testamentary provision, legacy, or other appointment executed prior to January 1, 1998, and valid under the law and jurisprudence prior to that date, when executed, is not invalidated by the passage of Acts 1997, No. 1421.

The Court noted that La. C.C. art. 1608(5) was enacted in La. Acts 1997, No. 1421, and that application of the law at the time of death would invalidate the testament.[2] *Gonzalez*, 868 So.2d at 991.

In the present case, unlike *Gonzales*, La. R.S. 9:2440 does not apply. There is no testamentary provision, legacy, or appointment in this case that would be invalidated by application of the law at the time of death. Rather, the legacies in Loy's 1994 notarial will lapsed by operation of law due to the legatees' deaths, and there is no testamentary provision indicating the testator's intent in such a situation.

Rebecca and Paul also argue that testamentary accretion under La. C.C. art. 1593 cannot apply herein, pursuant to La. R.S. 9:2440. They claim that the law at the time of the execution of a testament applies in this case. At the time Loy executed the 1994 notarial will, the law provided that in the event all legacies lapsed, the decedent's estate would devolve upon the legitimate heirs, who are Rebecca, Paul, Phyllis and David in this case.

As previously noted, La. C.C. art. 870 specifically provides that testate and intestate succession rights are governed by the law in effect at the time of the decedent's death. Further, the provisions of La. R.S. 9:2440 do not apply when there is no testamentary provision or legacy that would be invalidated by the passage of La. Acts 1997, No. 1421. Therefore, La. R.S. 9:2440 does not preclude the application of testamentary accretion in this case.

---

[2] Rebecca and Paul also cite *In re Succession of Clark*, 08-1278 (La. App. 1 Cir. 2/13/09), 6 So.3d 266, *writ denied*, 09-580 (La. 5/13/09), 8 So.3d 568, asserting that the appellate court in *Clark* reached the same conclusion as the court in *Gonzales*.

19-CA-348                                    15

Rebecca and Paul further contend that the trial court erred by construing La. C.C. art. 1611(B) to require a finding of ambiguity in the will before a court can consider the law in effect at the time the will was executed in order to ascertain the testator's intent. La. C.C. art. 1611(B) provides:

> When a testament uses a term the legal effect of which has been changed after the date of execution of the testament, the court may consider the law in effect at the time the testament was executed to ascertain the testator's intent in the interpretation of a legacy or other testamentary provision.

Rebecca and Paul argue that even a clear and unambiguous will can contain a "term the legal effect of which has been changed after the date of execution of the testament." However, in this case, the 1994 notarial testament does not contain any "term the legal effect of which has been changed after the date of execution of the testament." Accordingly, we find that La. C.C. art. 1611(B) does not apply in this matter.

Finally, Rebecca and Paul assert that because the lapse of all legacies in a testament would have resulted in his estate devolving intestate at the time the will was executed, Loy must have intended for his estate to devolve intestate in the event the legatees named therein predeceased him. However, the 1994 will does not contain any testamentary provision indicating that Loy wished his estate to devolve intestate in the event the legacies had lapsed. Without any testamentary provision to the contrary, we must apply the law in effect at the time of Loy's death in accordance with La. C.C. art. 870.

Based on our *de novo* review of Rebecca and Paul's motion for partial summary judgment on intestacy, we agree with the trial court that there were genuine issues of material fact that precluded summary judgment. We further find that the law at the time of Loy's death, including testamentary accretion pursuant to La. C.C. art. 1593, applies herein and thus, Phyllis and David are the sole heirs of Loy's estate.

**DECREE**

For the foregoing reasons, we affirm the trial court's April 22, 2019 amended final judgment finding Phyllis and David to be the sole heirs of Loy's succession and dismissing Rebecca and Paul's claims with prejudice. We also affirm the trial court's September 15, 2018 judgment denying Rebecca and Paul's motion for partial summary judgment.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**JANUARY 29, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 19-CA-348

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE GLENN B. ANSARDI (DISTRICT JUDGE)
CHRISTY M. HOWLEY (APPELLEE)          HAROLD E. MOLAISON (APPELLANT)          JACK E. MORRIS (APPELLANT)

**MAILED**
JUSTIN E. MOLAISON (APPELLANT)        M. ELIZABETH BOWMAN (APPELLEE)          WARREN E. MOULEDOUX, JR.
ATTORNEY AT LAW                       ATTORNEY AT LAW                         (APPELLANT)
111 VETERANS BOULEVARD                629 LAFAYETTE STREET                    ATTORNEY AT LAW
SUITE 1810                            GRETNA, LA 70053                        833 4TH STREET
METAIRIE, LA 70005                                                           GRETNA, LA 70053